IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RHONDA G. CHILDERS, ) | |
| Substituted party for ) | |
| Charles Enoch King, deceased, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 13-CV-459-PJC |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff, Rhonda G. Childers ("Childers"), substituted party for Charles Enoch King ("King"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying King's application for disability insurance benefits and supplemental security income benefits pursuant to the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be taken directly to the Tenth Circuit Court of Appeals. Childers appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that King was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

King was 58 years old at the time of the hearing before the ALJ on December 5, 2011. (R. 33). He was 5' 6" and weighed 160 pounds. *Id.* He had graduated from high school. (R.

34). King had last worked in July 2009 doing maintenance work, and he left that job when he hurt his back in a job-related injury. (R. 34-35).

King had been experiencing back problems for about twenty years and experienced a constant pain in his back, which he described as lower lumbar strain. (R. 37). The pain was "a real sharp nagging pain" which prevented him from lifting anything and forced him to change position every fifteen-to-twenty minutes. *Id.* A doctor gave him muscle relaxants to use at night and pain pills to use when he experienced extreme pain. (R. 37-38).

King had surgery to remove part of his colon in June 2011, with two later follow-up surgeries. (R. 38). King had problems with his right arm after falling and cracking his wrist. *Id.* He had previously had hardware in his right arm, but it had been taken out. (R. 38-39).

King could comfortably stand for at most thirty minutes and sit for about the same amount of time. (R. 39). King could walk for fifteen-to-twenty minutes before stopping to rest. *Id.* Bending forward, kneeling, squatting, stooping, crouching, and twisting his body all caused King increased pain. (R. 39-40). King could lift and carry twenty pounds. (R. 40). He had trouble sleeping because of pain and lack of activity. (R. 40-41). King had problems turning to look behind himself while driving. (R. 41).

King lived in an apartment by himself. *Id.* He did his own cleaning and cooking. (R. 41-42). He had problems bending over the sink to wash dishes and carrying heavy laundry baskets. (R. 42). King went grocery shopping once a week and walked his dog twice a day. (R. 43). King had been treated for depression twice, once after his mother passed away in 1999 and once in 1981 after he suffered burns over a large portion of his body. *Id.*

King presented to Hillcrest Medical Center on May 28, 2009, complaining of abdominal pain. (R. 226-36). He was experiencing sharp pain in the lower left quadrant of his abdomen,

radiating to his lower back. (R. 227). He suffered nausea and vomiting. *Id.* He smoked and had a past history of depression. *Id.* The doctor's impression was colitis. (R. 228). King returned to Hillcrest a day later with a moderately painful red rash on his back and legs. (R. 237-41). King was diagnosed with shingles. (R. 239).

King went to Harvard Family Physicians on June 22, 2009, because of pain in the lower left quarter of his abdomen and in his left flank. (R. 243, 245-46). He was also experiencing paresthesia. (R. 243). He was diagnosed with postherpetic neuralgia[1] and elevated blood pressure. *Id.* On July 23, 2009, he returned for a follow-up for his shingles and back pain. (R. 242, 244, 247). He was diagnosed with postherpetic neuralgia, back pain, and hypertension. *Id.* X-rays of King's lumbar spine taken that day showed osteopenia with moderate compression fractures in the lower thoracic spine; mild-to-moderate lumbar spondylosis; and atherosclerosis. (R. 247).

Bobby Daniel, D.O., examined King on July 29, 2009, apparently in connection with a worker's compensation claim. (R. 248-52). King complained of pain over the entirety of his low back with left leg radiculopathy with numbness. (R. 248). King stated that the pain became sharp when he attempted to move or lift anything. *Id.* Upon examination, Dr. Daniel found that King's spine was tender to palpation, with limited and painful range of motion. (R. 249). Right arm scarring was present consistent with previous surgery. *Id.* Dr. Daniel stated that in his opinion King was temporarily, totally disabled as a result of his back injury in 2009. *Id.* Dr. Daniel ordered physical therapy and prescribed ibuprofen and Flexeril. *Id.*

---

[1] Neuralgia after his episode of shingles. *Dorland's Illustrated Medical Dictionary* 863, 1525 (31st ed. 2007).

3

In an undated note, Carmen Oakes, A.R.N.P., with Dr. Daniel's office, wrote that King reported that he had been depressed and took too much medication, running his truck into the side of the road and being seen in an emergency room. (R. 252). On September 22, 2009, Oakes' assessments were shingles and hypertension, and King was given a prescription for medications. (R. 257-58). Oakes' assessments remained the same on October 7, 2009. (R. 256). On October 14, 2009, King complained of continued lumbar spinal pain which he described as constant and dull. (R. 255). Oakes' assessments were stable hypertension; resolved shingles, and lumbar strain. *Id.* Oakes ordered CT imaging of King's lumbar spine. *Id.* The CT imaging completed October 21, 2009, showed acute T12 vertebral compression fracture; moderate degenerative facet changes at L4/L5 and L5/S1 levels; and nonobstructing right kidney stone. (R. 267-68). King saw Oakes again on October 28, 2009 and continued ibuprofen, Flexeril, and physical therapy. (R. 254). On November 13, 2009, Oakes noted on examination of King's back that range of motion was intact and straight leg raising was negative. (R. 253). Her assessments were hypertension, thoracic lumbar strain, and depression. *Id.* She said that King was to follow up with an MRI and that she made referrals to Family & Children's Services and COPES. *Id.*

King presented to the emergency room at Oklahoma State University Medical Center (the "OSU Hospital") on May 27, 2011, complaining of abdominal pain, and he was admitted. (R. 315-45). A CT scan of King's abdomen showed "increased inflammatory changes around diverticulitis with encapsulated area of gas and fluid consistent with pericolonic abscess." (R. 316). King had an "exploratory laparotomy, sigmoid colon resection with Hartmann's procedure and take down of splenic flexure." (R. 322). On June 1, 2011, he had a second procedure. *Id.* King was discharged on June 3, 2011. (R. 322).

4

On June 8, 2011, Susan B. Young, D.O., Assistant Professor of Surgery at the OSU Hospital, saw King for his second postoperative visit. (R. 303). She wrote that King was "in a postoperative state and unable to work currently." *Id.* Dr. Young also wrote that they would be planning for a colostomy reversal within three to four months, and she said that in her opinion, King was disabled. *Id.* On July 19, 2011, King returned to the OSU Hospital to have a colonoscopy. (R. 390-400). King returned on August 24, 2011, to see Dr. Young for preparation of the colostomy reversal. (R. 430-32).

King was admitted to the OSU Hospital September 27, 2011, for the colostomy reversal, and he was discharged October 7, 2011. (R. 405-21). A pre-operative chest x-ray showed left acromioclavicular arthropathy. (R. 410-11). While King was hospitalized, David S. James, D.O. completed a consultation to evaluate hepatitis C and possible liver cirrhosis. (R. 412-14). King tested positive for hepatitis C, and he reported mild fatigue and weight loss. (R. 412). Dr. James' impression was "[a]dvanced fibrosis, possible early cirrhosis, likely due to chronic hepatitis C infection from remote IV drug use." (R. 413). Dr. James said that King would be a good candidate for treatment of his hepatitis C once he was completely healed from his surgeries. *Id.* The discharge summary stated that King was instructed to do no heavy lifting. (R. 407-08). King had sutures removed October 12, 2011. (R. 433).

King was seen at the OSU Physician's Clinic for routine follow-up on November 14, 2011. (R. 461-62). King had difficulty with daily activities due to the strain on his abdomen. (R. 461). He had poor dentition. *Id.* The physician's assessments were hypertension, hepatitis C, and recent abdominal surgery. *Id.*

Megan Clarkin signed a Medical Assessment of Ability to do Work-related Physical Activities on December 19, 2011. (R. 469-71). Clarkin found that King could, for a total at one

time, sit for one hour, stand for thirty minutes, and walk for fifteen minutes. (R. 469). During an eight-hour workday, King could sit for a total of four hours, stand for a total of one hour, and walk for a total of thirty minutes. *Id.* Clarkin noted that King needed to frequently move between positions. *Id.* Clarkin stated that King could rarely lift or carry up to five pounds, and never lift or carry a greater weight. (R. 470). To explain, Clarkin mentioned King's multiple abdominal surgeries, continued pain, and high risk of abdominal herniation with heavy lifting. *Id.* King could not climb, and he could bend, squat, crawl, and reach occasionally. *Id.* He was mildly restricted in activities involving unprotected heights. *Id.* Clarkin noted that the narcotic analgesics King sometimes used for pain could impair his alertness. *Id.*

Nonexamining agency consultant Penny Aber, M.D., completed a Physical Residual Functional Capacity Assessment on May 18, 2010. (R. 293-300). For exertional limitations, Dr. Aber found that King could perform work at the "medium" level. (R. 294). For explanation, Dr. Aber mentioned King's history of back pain, hypertension, and shingles. *Id.* She noted the results of the x-rays of King's lumbar spine. *Id.* Dr. Aber summarized King's activities of daily living. (R. 295). Dr. Aber stated that King's hepatitis C, liver problems, and hypertension would not impose any limitations. *Id.* She stated that the examining evidence regarding King's back problems did not support limitations more severe than in her assessment. *Id.* Dr. Aber said that shingles might have been "the main contributor to pain and this should improve over time." *Id.* For postural limitations, Dr. Aber said that King could occasionally stoop and could frequently climb, balance, kneel, crouch, and crawl. *Id.* Dr. Aber found no manipulative, visual, communicative, or environmental limitations. (R. 296-97).

Agency examining consultant Stephanie Crall, Ph.D., completed a mental status examination of King on April 7, 2010. (R. 269-73). King was alert, logical, goal-directed, and

fully intelligible. (R. 270). Dr. Crall found that King's ability to engage in work-related mental activities such as sustaining attention, understanding, remembering, and persisting was likely adequate for simple and some complex tasks. (R. 271). On Axis I,[2] Dr. Crall diagnosed King with polysubstance dependence, sustained partial remission; major depressive disorder, chronic, moderate; and posttraumatic stress disorder, chronic. (R. 272).

Nonexamining agency consultant Cynthia Kampshaefer, Psy.D., completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment on May 17, 2010. (R. 275-92). On the Psychiatric Review Technique form, for Listing 12.04, Dr. Kampschaefer noted depressive syndrome. (R. 282). For Listing 12.09, Dr. Kampschaefer noted behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system. (R. 287). For the "Paragraph B Criteria,"[3] King had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 289). He experienced no episodes of decompensation. *Id.* In the "Consultant's Notes" portion of the form, Dr. Kampschaefer described the treating evidence and King's claims regarding his mental health. (R. 291). She summarized Dr. Crall's report and King's activities of daily living. *Id.* Dr.

---

[2] The multiaxial system "facilitates comprehensive and systematic evaluation." *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

[3] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

Kampschaefer said that King's history of mild depression and drug use appeared to have little effect on his activities of daily living. *Id.*

On the Mental Residual Functional Capacity Assessment, Dr. Kampschaefer found that King was moderately limited in his ability to understand, remember, and carry out detailed instructions and in his ability to interact appropriately with the general public. (R. 275-76). He had no other significant limitations. *Id.* In her narrative assessment, Dr. Kampschaefer said that King could perform simple and some complex tasks, relate to others on a superficial work basis, and adapt to a work situation. (R. 277).

## Procedural History

King filed his applications for disability insurance benefits and supplemental security income benefits in November 2009. (R. 144-50). King asserted onset of disability on July 3, 2009. (R. 144). The applications were denied initially and on reconsideration. (R. 57-64, 71-76). An administrative hearing was held before ALJ Charles Headrick on December 5, 2011. (R. 29-50). By decision dated January 27, 2012, the ALJ found that King was not disabled. (R. 17-27). On April 26, 2013, the Appeals Council denied review. (R. 4-8). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole,

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

### Decision of the Administrative Law Judge

In his decision, the ALJ found that King met insured status requirements through June 30, 2012. (R. 19). At Step One, the ALJ found that King had not engaged in any substantial gainful activity since his alleged onset date of July 3, 2009. *Id.* At Step Two, the ALJ found that King had severe impairments of degenerative disc disease of the lumbar spine and depression. *Id.* At Step Three, the ALJ found that King's impairments did not meet any Listing. *Id.*

The ALJ found that King had the RFC to perform a range of work at the medium exertional level, with occasional stooping and frequent climbing, balancing, crouching, and crawling. (R. 21). For mental limitations, the ALJ said that King was moderately limited in his ability to understand, remember, and carry out detailed instructions, as well as in his ability to interact with the general public. *Id.* He said that King could do simple and some complex tasks, could relate to others on a superficial work basis, and could adapt to a work situation. *Id.* At Step Four, the ALJ determined that King could return to past relevant work. (R. 26). As an alternative finding at Step Five, the ALJ found that there were a significant number of jobs in the national economy that King could perform, taking into account his age, education, work experience, and RFC. (R. 26-27). Therefore, the ALJ found that King was not disabled at any time from July 3, 2009, through the date of his decision. (R. 27).

### Review

Childers asserts four areas of error by the ALJ. First, she asserts that the ALJ erred in his consideration of the vocational impact of his finding that King was limited to occasional stooping. Plaintiff's Opening Brief, Dkt. #22, p. 5. Second, she asserts that the ALJ erred at Step Five in his

decision regarding what jobs King could perform with his RFC. *Id.* Third, she argues that aspects of the ALJ's RFC were not supported by substantial evidence. *Id.* Fourth, she argues that King's death is new and material evidence that requires a remand. Regarding the issues raised by Childers, the Court finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements. Thus, the ALJ's decision is **AFFIRMED**.

**Steps Four and Five**

The ALJ limited King to only occasional stooping. (R. 21). Childers argues that King's past work required frequent stooping and therefore the ALJ erred by finding that King could perform this past relevant work. Plaintiff's Opening Brief, Dkt. #22, pp. 5-6. Childers argues that the vocational expert (the "VE") attempted to revise her testimony when she realized that she had mistakenly not taken into account the limitation to occasional stooping. (R. 46-48). Childers asserts that the flaw in the VE's testimony also affects Step Five, because one of the two jobs identified by the VE, floor waxer, required frequent stooping. Plaintiff's Opening Brief, Dkt. #22, pp. 6-8.

The Court agrees with Childers that the testimony of the VE is ambiguous enough regarding stooping that it does not constitute substantial evidence regarding Step Four and regarding the job of floor waxer at Step Five. "Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the [ALJ's] decision." *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) (quotation omitted). Here, the ALJ's question related the impairment of limitation to only occasional stooping, and the VE initially answered that King would be able to perform his past relevant work and the floor waxer job with that limitation. (R. 46-48). However, the VE then did make a reference in her later testimony that this reviewer finds was an attempt on her part to

revise her earlier testimony by explaining that she had failed to include the limitation of occasional stooping in that testimony. (R. 48). Given that the VE attempted to revise her testimony and did not give a complete explanation of how that revision would affect the jobs that included stooping, the VE's testimony is not substantial evidence upon which the ALJ was entitled to rely regarding King's previous relevant work at Step Four or the floor waxer job at Step Five.

In spite of this error, the ALJ's Step Five finding is supported by substantial evidence in the form of the testimony of the VE identifying a hand packager job. Childers concedes that the hand packager job identified by the VE does not require frequent stooping, as the other jobs at Step Four and Step Five did. Instead, Childers makes a much more complicated argument in an attempt to discredit the hand packager job from being substantial evidence upon which the ALJ could rely. She says, citing the Dictionary of Occupational Titles (the "DOT"), that the hand packager job requires constant lifting of ten pounds. DOT 920.587-018, 1991 WL 687916. She states that the ALJ did not make a finding regarding what weight King could constantly lift, but he only found that King could frequently lift 20 pounds and occasionally lift 50 pounds. Plaintiff's Opening Brief, Dkt. #22, pp. 7-8. The Court finds this argument unpersuasive because the DOT states that the hand packager job, including its requirements regarding constant lifting, is a job in the medium exertional level. DOT 920.587-018, 1991 WL 687916. The ALJ stated that King could perform work within the medium exertional level. (R. 21). The VE testified that King was capable of performing the hand packager job given the RFC determination of the ALJ. (R. 46-48). The VE said that her testimony was consistent with the DOT. (R. 49). On the question of whether King could perform medium work as a hand packager, the VE's testimony was not ambiguous, as was true of her testimony regarding the effect of the limitation to occasional

stooping; therefore, the VE's testimony constituted substantial evidence upon which the ALJ was entitled to rely at Step Five. *See, e.g., Lately v. Colvin*, 560 Fed. Appx. 751, 755 (10th Cir. 2014) (unpublished) (VE's testimony that identified jobs were consistent with the DOT was substantial evidence supporting the ALJ's decision); *Thompson v. Colvin*, 551 Fed. Appx. 944, 949 (10th Cir. 2014) (unpublished) ("This court will not evaluate in the first instance whether a claimant is able to perform specific jobs," but role is limited to whether there is substantial evidence supporting decision).

At Step Five the ALJ's decision was supported by the substantial evidence provided by the VE's testimony, and therefore the Court affirms.

**Substantial Evidence Supported the RFC Determination**

Childers argues that the ALJ's RFC determination that King had the ability to lift at the medium exertional level was not supported by substantial evidence. Plaintiff's Opening Brief, Dkt. #22, pp. 8-10. She first argues that an "analyst" at the agency indicated that the x-rays of King's spine were consistent with an ability to perform light work, and she calls this an "opinion." *Id.* at 8-9. A review of the document cited by Childers does not support this characterization. The document is entitled "Case Analysis," and it appears to be made up of a question and an answer, and it has an electronic signature of Dr. Aber, a medical doctor. (R. 274). The question portion of the document refers to several items of treating medical evidence, including the July 2009 x-ray of King's lumbar spine. *Id.* The question is then posed: "Can we rate with evidence in file, if so, is a light RFC appropriate?" *Id.* The answer is clear that Dr. Aber found that an RFC with medium exertional level with occasional stooping was appropriate. *Id.* Therefore, even though the question references the "light" exertional level, it is not an opinion that King was limited to that level. The true opinion here is the response of Dr. Aber concluding that medium exertional level

13

with occasional stooping was the correct RFC determination. Given this, the rest of Childers' argument, including that the ALJ had a duty to reconcile the x-rays with the opinion of Dr. Aber, has no force.

Childers also attempts to cite to other evidence that she asserts shows that King could not perform work at the medium exertional level, including King's activities of daily living and the results of imaging of his spine. Plaintiff's Opening Brief, Dkt. #22, p. 9. These arguments are essentially a request that this Court reweigh the evidence, emphasizing the evidence that supports King's disability claim, while discounting the evidence that does not support it. The Court must decline this invitation. *Newbold v. Colvin*, 718 F.3d 1257, 1265 (10th Cir. 2013). While King's case might be susceptible to conclusions that differ from those made by the ALJ, it is not the Court's role to make findings in the first instance. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"); *Allen v. Barnhart,* 357 F.3d 1140, 1143-45 (10th Cir. 2004) (court acts within confines of its administrative review authority). The ALJ's conclusion that King was capable of performing medium work was supported by substantial evidence in the form of Dr. Aber's Physical Residual Functional Capacity Assessment. *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (nonexamining consultant's opinion was an acceptable medical source which the ALJ was entitled to consider and which supported his RFC determination).

The final argument of Childers in this section of her brief relates to whether the ALJ properly considered King's 2011 surgeries and the disability opinions given by the doctors who treated him at that time. Plaintiff's Opening Brief, Dkt. #22, pp. 9-10. Childers also refers to King's liver condition in this argument. *Id.* Childers' argument, however, is undermined by King's own testimony at the hearing on December 5, 2011, after the surgeries and the discovery

that King's liver needed treatment once he had completely healed from the surgeries. King only mentioned the surgery in one small portion of his testimony. (R. 38). At the urging of his attorney, King emphasized that his pain was a result of his lower back problems. (R. 37-45). This reviewer has found no reference to King's liver or hepatitis C in the hearing transcript. King's attorney at the hearing made no reference to King's 2011 surgeries or his liver condition in either his opening statement or at the close of the hearing, when he emphasized the imaging supported King's testimony regarding his difficulties with his back. (R. 32-33, 49). When a claimant is represented by counsel, the ALJ can ordinarily rely on counsel to structure and present the claimant's case. *Hawkins v. Chater*, 113 F.3d 1162, 1166-67 (10th Cir. 1997).

Given all of these circumstances, the ALJ concluded that King's claim of disability was based neither on his 2011 surgeries nor on his liver issues. He did not include either of these in his finding or discussion at Step Two. (R. 19). He summarized the treating evidence. (R. 24). The ALJ then stated that King was expected to recover from the 2011 surgeries within 12 months. (R. 25). He noted that King "did not report his abdominal surgery to be an impairment at the hearing." *Id.* The ALJ's conclusion that the 2011 surgeries and King's liver issues were not part of King's claim of disability was supported by substantial evidence. The ALJ was, therefore, not required to discuss the treating physician opinions that related to these conditions that were not part of King's claim. The ALJ did not commit reversible error in the way that he handled King's 2011 surgeries or his liver condition.

The ALJ's RFC determination was supported by substantial evidence and complied with legal requirements.

**New and Material Evidence**

King died in November 2013, during the pendency of this action. Suggestion of Death, Dkt. #17. The death certificate lists the immediate cause of King's death as "mixed drug intoxication (methadone, morphine)." *Id.* Childers asserts that this is new and material evidence that warrants a remand so that the ALJ can consider it.

42 U.S.C. § 405(g) provides that a reviewing court may remand at any time if there is new and material evidence that was not available earlier for review. *Mays v. Colvin*, 749 F.3d 569, 573 (10th Cir. 2014). The Tenth Circuit has said that evidence is material "if there is a reasonable possibility that it would have changed the outcome." *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003) (further quotation omitted).

The Court finds that King's death and the finding that his death was caused by mixed drug intoxication are not material to his claim. His death in November 2013 was approximately 22 months after the ALJ's decision in January 2012, and it was therefore well outside of the relevant time period. Childers argues that King's death from mixed intoxication is evidence relating to the relevant time period because it reflects that his pain continued and was more severe than the ALJ found. The Court finds Childers' attempts to link the evidence regarding King's death to the relevant time period to be unpersuasive. There is not a reasonable possibility that evidence of King's death from mixed drug intoxication would have changed the outcome of his application, and therefore this evidence is not material within the meaning of Section 405(g). Remand is not required based on this evidence.

**Conclusion**

If this Court were deciding King's claim in the first instance, it is possible that the undersigned would have reached much different findings than those found by the ALJ. However, the Court here has a much more limited role in reviewing the ALJ's findings.

> The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.

*Cowan v. Astrue*, 552 F.3d 1182, 1185 (10th Cir. 2008) (further quotation omitted).

The decision of the Commissioner is supported by substantial evidence and complies with legal requirements. The decision is **AFFIRMED**.

Dated this 22nd day of September 2014.

_____
Paul J. Cleary
United States Magistrate Judge